No. 25-2173

---

# In the United States Court of Appeals
# for the Eighth Circuit

---

Ross Christensen,
*Plaintiff-Appellant,*

v.

Union Pacific Railroad Co.,
*Defendant-Appellee.*

------------------------------------------------

On Appeal from the United States District Court
for the District of Nebraska - Omaha
No. 8:23-cv-00268-RFR-MDN (The Hon. Robert F. Rossiter, Jr.)

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

James H. Kaster
NICHOLS KASTER, PLLP
4700 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
(612) 256-3200
kaster@nka.com

*Counsel for Plaintiff-Appellant*
*Ross Christensen*

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Ross Christensen respectfully requests an opportunity to present oral argument in this appeal. This case presents an important issue central to employers' obligation to comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*: Is an employer entitled to summary judgment on the narrow and fact-intensive direct-threat affirmative defense in the face of controverted medical opinion and conflicting testimony? *See E.E.O.C. v. Drivers Mgmt., LLC*, 142 F.4th 1122 (8th Cir. 2025) (affirming summary judgment *for the plaintiff* on the direct-threat defense because defendant did not offer sufficient evidence to meet its high burden); *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1062 (8th Cir. 2024) (confirming that controverted medical opinion and testimony precludes summary judgment on the direct-threat defense). Argument will assist the Court in resolving this important legal issue.

For these reasons, Mr. Christensen requests 15 minutes of oral argument.

i

Appellate Case: 25-2173    Page: 2    Date Filed: 08/27/2025 Entry ID: 5552097

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Ross Christensen makes the following required disclosures:

1.	Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

2.	Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No.**

Date: August 27, 2025

<u>s/James H. Kaster</u>
James H. Kaster

ii

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT.......... i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF CONTENTS................................................................................... iii

TABLE OF AUTHORITIES...........................................................................vi

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................... 5

STATEMENT OF THE ISSUE......................................................................... 6

STATEMENT OF THE CASE........................................................................... 7

A.  After more than 10 years working for UP, Christensen suffered an off-duty stroke and was placed on a 1-year work restriction. ......................................... 7

B.  By 2016, Christensen satisfied UP's RTW requirements, his atrial fibrillation was successfully treated, he was cleared to work without restrictions by his treating physicians, and he was cleared by a certified FMCSA medical examiner. ........................................................................................................ 10

    1.  Christensen was cleared to RTW by his neurologist, a leading specialist in post-stroke medicine........................................................................... 10

    2.  Christensen was cleared to RTW by his cardiologist, a highly qualified specialist who has treated thousands of stroke patients......................... 12

    3.  Christensen's atrial fibrillation was completely and successfully treated, and he was cleared to RTW by his electrophysiologist, a second neurologist, and a family physician........................................................ 14

    4.  Christensen was cleared for his commercial driver's license by a certified FMCSA medical examiner. ................................................................. 15

Appellate Case: 25-2173    Page: 4    Date Filed: 08/27/2025 Entry ID: 5552097

C.      UP permanently ended Christensen's career when it imposed restrictions based on a new blanket policy and denied his RTW in 2016, 2018, and 2020. ....... 15

D.      UP's off-the-rack policy adopts a misguided interpretation of an obsolete handbook for a different industry. .................................................. 20

E.      The district court granted summary judgment for UP on the fact-intensive affirmative direct-threat defense and Christensen appeals ............................ 25

SUMMARY OF ARGUMENT ........................................................................ 27

ARGUMENT ................................................................................................. 31

I.      The district court took the wrong approach and reached the wrong result in granting summary judgment for UP on the direct-threat affirmative defense. 31

        A.      Standard of Review ........................................................................ 31

        B.      The district court's erroneous analysis cannot be reconciled with controlling precedent, the standard for summary judgment, or the factual record ......................................................................................... 32

                1.      The district court's analysis reflects a fundamental misunderstanding of the high bar that the fact-intensive direct-threat affirmative defense requires at summary judgment. ........ 33

                2.      The district court misstated the facts and improperly resolved genuine disputes in favor of UP. ................................................. 38

                3.      The district court's approach eviscerates the protections the ADA is designed to guarantee. ......................................................... 39

        C.      Under this Court's binding precedent in *Werner* and *Sanders*, UP is not entitled to summary judgment on its fact-intensive, direct-threat defense. ......................................................................................... 41

                1.      UP's off-the-rack approach dooms its direct-threat defense. ...... 45

                2.      A jury could find that the blanket 5-year work restrictions were not objectively reasonable, based on the controverted testimony. .... 48

iv

    3.      UP failed to prove it relied on the best and most current objective medical evidence. .......................................................... 52

CONCLUSION ................................................................................... 55

CERTIFICATE OF COMPLIANCE ...................................................... 56

CERTIFICATE OF SERVICE ............................................................. 57

Appellate Case: 25-2173    Page: 6    Date Filed: 08/27/2025 Entry ID: 5552097

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ................................................................. 32, 38

*Baker v. Union Pac. R.R. Co.,*
 580 F.Supp.3d 647 (D. Neb. 2022) ..................................... 36, 37, 52

*Baldwin v. Union Pac. R.R. Co.,*
 24-3135, 2025 WL 2179316 (8th Cir. 2025) ................................. 6, 34, 51, 52

*Becker v. City of Hillsboro,*
 125 F.4th 844 (8th Cir. 2025) ................................................. 32, 34

*Berner v. Metro. Council,*
 2023 WL 3343943 (D. Minn. May 10, 2023) ................................ 36

*Bragdon v. Abbott,*
 524 U.S. 624 (1998) ................................................................ 55

*Branham v. Snow,*
 392 F.3d 896 (7th Cir. 2004) ................................................... 46

*Brasier v. Union Pac. R.R. Co.,*
 2023 WL 2754007 (D. Ariz. March 31, 2023) .............................. 53

*Campbell v. Union Pac. R.R. Co.,*
 2020 WL 5300734 (D. Idaho Sept. 4, 2020) ................................ 52

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ............................................................. 32, 44

*Echazabal v. Chevron USA, Inc.,*
 336 F.3d 1023 (9th Cir. 2003) ................................................. 37, 51

*E.E.O.C. v. Drivers Mgmt., LLC,*
 142 F.4th 1122 (8th Cir. 2025) ........................................... *passim*

Appellate Case: 25-2173  Page: 7  Date Filed: 08/27/2025 Entry ID: 5552097

*E.E.O.C. v. E.I. Du Pont de Nemours & Co.,*
480 F.3d 724 (5th Cir. 2007)......................................................................... 37

*E.E.O.C. v. Hibbing Taconite Co.,*
720 F.Supp.2d 1073 (D. Minn. 2010) ........................................................... 40

*E.E.O.C. v. Wal-Mart Stores, Inc.,*
477 F.3d 561 (8th Cir. 2007)................................................................. *passim*

*Granas v. Union Pacific R.R. Co.,*
1:21-cv-00116-AA, No. 121 (June 9, 2025) ................................................... 39

*Hamlin v. Charter Tp. of Flint,*
165 F.3d 426 (6th Cir. 1999)........................................................................ 38

*Int'l Shortstop, Inc. v. Rally's Inc.,*
939 F.2d 1257 (5th Cir. 1991)...................................................................... 32

*Justice v. Crown Cork & Seal Co.,*
527 F.3d 1080 (10th Cir. 2008)................................................................... 36

*Lissau v. Southern Food Service, Inc.,*
159 F.3d 177 (4th Cir. 1998)........................................................................ 37

*Lowe v. Alabama Power Co.,*
244 F.3d 1305 (11th Cir. 2001).................................................................... 54

*Mayer v. Union Pac. R.R. Co.,*
8:23CV225, 2025 WL 1827621 (D. Neb. July 2, 2025)..................... 26, 37, 53

*Michael v. City of Troy Police Dep't.,*
808 F.3d 304 (6th Cir. 2015)............................................................. 27, 34, 35

*Micone v. Levering Reg'l Health Care Ctr., LLC,*
132 F.4th 1074 (8th Cir. 2025)..................................................................... 36

*Nall v. BNSF Ry. Co.,*
917 F.3d 335 (5th Cir. 2019)........................................................................ 46

Appellate Case: 25-2173    Page: 8    Date Filed: 08/27/2025 Entry ID: 5552097

*Osborne v. Baxter Healthcare Corp.,*
798 F.3d 1260 (10th Cir. 2015).........................................................38, 41, 54

*PGA Tour, Inc. v. Martin,*
532 U.S. 661 (2001) ..................................................................................... 39

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ................................................................................31, 38

*Rizzo v. Children's World Learning Ctr.,*
84 F.3d 758 (5th Cir. 1996)....................................................................2, 37, 41

*Sanders v. Union Pac. R.R. Co.,*
108 F.4th 1055 (8th Cir. 2024) ...........................................................*passim*

*Stragapede v. City of Evanston,*
865 F.3d 861 (7th Cir. 2017)....................................................................... 37

*Sutton v. United Air Lines, Inc.,*
527 U.S. 471 (1999) ..................................................................................... 46

*Torgerson v. City of Rochester,*
643 F.3d 1031 (8th Cir. 2011)...............................................................31-32, 51

*Turner v. Ferguson,*
149 F.3d 821 (8th Cir. 1998)................................................................2, 31, 32

*Wealot v. Brooks,*
865 F.3d 1119 (8th Cir. 2017).............................................................31, 34, 38

## RULES, STATUTES, REGULATIONS

Fed. R. Civ. P. 56(a)...............................................................................27, 28

Fed. R. App. P. 26.1 ..................................................................................... ii

Fed. R. App. P. 32 ........................................................................................ 57

8th Cir. L.R. 28A(h)(2) ................................................................................ 57

Appellate Case: 25-2173    Page: 9    Date Filed: 08/27/2025 Entry ID: 5552097

28 U.S.C. § 1291 ........................................................................... 5

28 U.S.C. § 1331 ........................................................................... 5

42 U.S.C. § 12101 ............................................................. i, 1, 5, 25

42 U.S.C. § 12111(3) ............................................................ 2, 3, 6, 25

42 U.S.C. § 12113(b) ................................................................ 2, 6, 25

29 C.F.R. § 1630.2(r) .................................................................. *passim*

## OTHER AUTHORITIES

87 Fed. Reg. 50282 (Aug. 16, 2022) ......................................... 22, 49

8th Cir. Model Jury Instr. § 9.61 ................................................... 36

Appellate Case: 25-2173     Page: 10     Date Filed: 08/27/2025 Entry ID: 5552097

INTRODUCTION

This is an appeal from the district court's May 23, 2025, order granting summary judgment in favor of Defendant-Appellee Union Pacific ("UP") on its direct-threat affirmative defense. Add. 2, App.Vol. 8 at 1889, **R. Doc. 74, at 16**.[1] The district court concluded that UP's decision to extend Christensen's work restrictions—based on an off-the-rack policy from obsolete and inapplicable guidance—satisfied every element of the defense as a matter of law. This holding is clear error and should be reversed.

The ADA firmly establishes an expansive general rule: employers are prohibited from discriminating based on disability. 42 U.S.C. § 12101 *et seq.*; *E.E.O.C. v. Drivers Mgmt., LLC,* 142 F.4th 1122, 1130 (8th Cir. 2025) (aka "*Werner*"). This general rule is designed to comprehensively protect individuals against disability discrimination of all forms, both conspicuous and inconspicuous. Accordingly, the few exceptions to this general rule are narrow, rigid, and highly-fact-intensive, like the direct-threat affirmative defense.

The direct-threat affirmative defense carves a narrow exception to the ADA's broad prohibition against disability discrimination. This defense requires an employer to affirmatively prove that its discrimination was justified by a determination that the

---

[1] Christensen is submitting his appendix in 8 volumes and citations appear in the format, "App.Vol. volume at page".

1

employee posed a direct-threat to the health or safety of themselves or others, that cannot be eliminated or reduced by reasonable accommodation. 42 U.S.C. §§ 12111(3), 12113(b); 29 C.F.R. § 1630.2(r). The requisite determination of a significant risk of substantial harm to health or safety that cannot be mitigated by reasonable accommodation must be made at the time of each discriminatory action. *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1062 (8th Cir. 2024) (citing 29 C.F.R. § 1630.2(r)). In raising this defense, UP bears the substantial burden of demonstrating that its direct-threat determination "was: (1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the most current medical knowledge and/or on the best available objective evidence." *Id.*

Due to these fact-intensive and rigorous requirements, summary judgment on the direct-threat defense is rarely appropriate. When a party seeks summary judgment on an affirmative defense, it must prove every element as a matter of law, leaving no room for a jury to disagree. Consequently, "summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998); *Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 764 (5th Cir. 1996) (explaining that affirmative defenses are ill-suited for summary judgment). As this Court's precedent makes clear, an employer is not entitled to summary judgment on its direct-threat defense when the record contains conflicting

2

testimony, controverted medical opinions, or fact issues that could persuade a jury to reject the defense. *Werner,* 142 F.4th at 1133; *Sanders*, 108 F.4th at 1062.

Despite the fact-intensive nature of the question and the demanding burden of proof, the district court erroneously granted summary judgment for UP. In so doing, the court gave sweeping deference to UP's Chief Medical Officer, reasoning that his opinion should be legally affirmed even in the face of conflicting testimony and documented evidence that Christensen could safely return to work under the Federal Motor Carrier Safety Administration ("FMCSA") standards that UP purportedly follows. The court never grappled with UP's heavy burden of proof on this fact intensive defense. Under the district court's analysis, an employer can violate the ADA and escape all liability at summary judgment, so long as it relies on *any* medical judgment. This is contrary to the plain text of the ADA. *See* 42 U.S.C. § 12111(3); 29 C.F.R. 1630.2(r); *Werner*, 142 F.4th at 1133 (echoing the ADA's clear ban on discrimination based on prejudice, stereotypes, or unfounded fears).

Christensen worked as a conductor for UP for over a decade before experiencing an off-duty stroke in 2015. Following the stroke, Christensen was placed on 1-year work restrictions and made a complete recovery by the end of 2015, met UP's return-to-work ("RTW") requirements, and was ready to continue his career. However, in 2016, UP imposed new 5-year restrictions based solely on its new blanket, off-the-rack, policy. It did not matter, said UP, that Christensen had undergone a

3

successful ablation procedure fully resolving his atrial fibrillation, had never experienced any seizures or recurrent strokes, and was cleared to RTW by his treating physicians and an FMCSA medical examiner. UP's decision to hyper-extend the restrictions relied solely on a defunct interpretation of obsolete recommendations for a different industry: the 2014 FMCSA's Medical Examiners Handbook ("MEH") for commercial driving certifications. Long before UP adopted its new policy, the MEH had been declared obsolete by the FMCSA because it relied on outdated medical knowledge and improperly suggested mandatory blanket approaches to medical examinations. UP's policy is rot with these same flaws. Without ever conducting an examination of the worker, UP's policy categorically imposes blanket 5-year work restrictions on any employee that experiences a stroke that, according to outdated medical knowledge and UP's questionable assumptions, produces a heightened risk.

The core issue is whether UP conducted a properly individualized assessment of Christensen's ability to RTW and relied on the best objective evidence and/or most current medical knowledge in reaching an objectively reasonable determination that considers severity, likelihood, and nature of the risk. This Court's precedent in *Werner* and *Sanders* easily resolves this issue. *Werner*, 142 F.4th at 1133 (affirming the denial of the employer's direct-threat defense as a matter of law because the "one-size-fits-all approach" cannot sustain a direct-threat defense); *Sanders*, 108 F.4th at 1064 (affirming the denial of summary judgment and upholding the jury's rejection of

4

the direct-threat defense). Under this precedent, UP's one-size-fits-all policy and the conflicting medical opinions preclude summary judgment, and these factual disputes should be decided by a jury.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the federal Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); App.Vol. 1 at 11, R. Doc. 1, at 1. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court granted final judgment to UP on its affirmative defense on May 23, 2025. Add. 1, App.Vol. 8 at 1890, R. Doc. 75, at 1. Christensen timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on June 12, 2025. App.Vol. 8 at 1891, R. Doc. 76, at 1.

Appellate Case: 25-2173     Page: 15     Date Filed: 08/27/2025 Entry ID: 5552097

# STATEMENT OF THE ISSUE

Whether the district court erred by granting summary judgment against Christensen on UP's affirmative direct-threat defense.

Apposite cases on this issue include *E.E.O.C. v. Drivers Mgmt., LLC*, 142 F.4th 1122 (8th Cir. July 10, 2025); *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055 (8th Cir. 2024); *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561 (8th Cir. 2007); *Baldwin v. Union Pac. R.R. Co.*, 24-3135, 2025 WL 2179316 (8th Cir. 2025).

The most apposite statutory and regulatory provisions on this issue include 42 U.S.C. §§ 12111(3) and 12113(b), and 29 C.F.R. § 1630.2(r).

Appellate Case: 25-2173     Page: 16     Date Filed: 08/27/2025 Entry ID: 5552097

STATEMENT OF THE CASE

**A.**     **After more than 10 years working for UP, Christensen suffered an off-duty stroke and was placed on a 1-year work restriction.**

UP first hired Christensen in July 2004. App.Vol. 1 at 18, R. Doc. 1, at 8. Christensen remained a loyal employee for over 10 years, as a trainman, switchman, brakeman, and most recently, conductor. App.Vol. 5 at 960-62, R. Doc. 63-6, at 25:9-27:25[2]. Throughout this time, Christensen maintained the skills and experience required to perform his job duties. John Bills ("Bills"), Christensen's former co-worker, describes Christensen as an exemplary conductor and employee for UP. App.Vol. 8 at 1754, R. Doc. 66, at 1. Bills described Christensen as fully capable of performing all conductor duties, including switching operations, train and equipment inspections, communicating and reporting information concerning train movement, interpreting signals, providing customer service, and practicing safe work habits. *Id.* Bills testified that Christensen consistently performed the job duties with reliable attendance and work ethic. *Id.*; App.Vol. 1 at 90-92, R. Doc. 50-1, at 2-4.

On January 9, 2015, while off duty, Christensen visited the hospital with right-side weakness, altered mental state, and aphasia, and learned he was experiencing an ischemic stroke. App.Vol. 1 at 18, R. Doc. 1, at 8; App.Vol. 3 at 575, R. Doc. 51-8, at

---

[2] For citations to deposition transcripts, the citation is to the page:line of the deposition. For all other record citations, the citation is to the ECF page number.

7

2. Luckily, Christensen received prompt medical treatment and recovered quickly from his stroke. App.Vol. 4 at 669, 681, R. Doc. 63-1, at 12:2-13, 24:1-7. A CT scan of his brain showed no significant left-sided hypodensity, no mass effect, and no intracranial hemorrhage or extra-axial fluid collection. App.Vol. 3 at 484-88, R. Doc. 51-5, at 118-122; App.Vol. 7 at 1678, R. Doc. 64-5, at 2. Christensen was diagnosed with atrial fibrillation, a common cause of stroke. App.Vol. 4 at 733, R. Doc. 63-2, at 17:1-11; App.Vol. 4 at 674, R. Doc. 63-1, at 17:16-25; App.Vol. 3 at 486, R. Doc. 51-5, at 120. Christensen underwent medical evaluations to assess his condition, and while he had weakness on one side of his body in the hours immediately following the stroke, he was treated in time to address his symptoms. App.Vol. 4 at 686-87, R. Doc. 63-1, at 29:12-30:9; App.Vol. 7 at 1668, R. Doc. 64-2, at 2. Christensen's prompt and thorough medical treatment following his stroke prevented long-term damage or a lengthy recovery that may have otherwise occurred. App.Vol. 4 at 686-87, R. Doc. 63-1, at 29:12-30:9; App.Vol. 7 at 1668, R. Doc. 64-2, at 2. Within a week after the stroke, most of Christensen's symptoms had resolved; he had no apparent aphasia, and he was discharged from the hospital on January 13, 2015. *Id.*; App.Vol. 4 at 686-87, R. Doc. 63-1, at 29:12-30:9. That same day, Christensen's treating neurologist, Dr. Kevin Call ("Call"), cleared him to return to work as a conductor by the end of February 2015. App.Vol. 7 at 1666, R. Doc. 64-1, at 2; App.Vol. 4 at 696-97, R. Doc. 63-1, at 39:2-40:23.

8

Following Christensen's stroke, UP initiated a Fitness-for-Duty ("FFD") evaluation of Christensen. App.Vol. 3 at 428, R. Doc. 51-5, at 62. Dr. John Charbonneau ("Charbonneau") was the first UP doctor to perform an FFD for Christensen. App.Vol. 3 at 544, R. Doc. 51-7, at 14. Charbonneau testified to his extensive experience conducting UP's FFD evaluations. App.Vol. 4 at 874-78, R. Doc. 63-4, at 6:17-10:17. Charbonneau reviewed Christensen's medical records, including a post-stroke CT scan that showed "ischemia without evident infarct" and a thoracic aortic aneurysm measuring 4.1 cm, below the level that UP considered disqualifying. App.Vol. 4 at 674, R. Doc. 63-1, at 17:16-25; App.Vol. 3 at 543, R. Doc. 51-7, at 13. Charbonneau did not physically examine or interview Christensen or his treating physicians but acknowledged that physically examining or interviewing employees could expand his knowledge base beyond the information attainable from medical records alone. App.Vol. 4 at 884, R. Doc. 63-4, at 16:6-9.

In March, 2015, after Charbonneau's FFD, UP informed Christensen that it had imposed a 1-year work restriction that would last "until 1-9-16." App.Vol. 3 at 543, R. Doc. 51-7, at 13; App.Vol. 3 at 575, R. Doc. 51-8, at 2; App.Vol. 3 at 578, R. Doc. 51-9, at 2. According to Charbonneau, "to be eligible to RTW on 1/9/2016, [Christensen] must remain Neurologic event-free until [1/9/2016], and... must have a stable, detailed neurologic evaluation right before the intended RTW date" and "a cardiology [follow-up] with an ECHO or other screening test to demonstrated [sic]

9

that the diameter of his [thoracic-aortic] aneurysm is stable." App.Vol. 3 at 543-44, R. Doc. 51-7, at 13-14.

**B.** **By 2016, Christensen satisfied UP's RTW requirements, his atrial fibrillation was successfully treated, he was cleared to work without restrictions by his treating physicians, and he was cleared by a certified FMCSA medical examiner.**

Christensen made a complete recovery, did not experience any seizures or recurrent strokes, underwent successful atrial fibrillation treatment and by the end of the 1-year restriction, Christensen had satisfied each of UP's RTW requirements and was cleared after examination by a certified FMCSA medical examiner. App.Vol. 8 at 1743, R. Doc. 64-7, at 4; App.Vol. 4 at 905, R. Doc. 63-4, at 37:2-25. Christensen's updated medical records and work clearances demonstrate his ability to safely return to work.  App.Vol. 3 at 540, R. Doc. 51-7, at 10.

**1.** **Christensen was cleared to RTW by his neurologist, a leading specialist in post-stroke medicine.**

On January 13, 2015, Call cleared Christensen to RTW as a conductor by the end of February 2015. *Supra* at 8. Call testified that because of early, successful treatment following his stroke, Christensen was able to perform all the same duties, in the same way, within 3-4 weeks post-stroke as he could before the stroke. App.Vol. 4 at 696-98, R. Doc. 63-1, at 39:2-41:20; App.Vol. 7 at 1666, R. Doc. 64-1, at 2. Call testified that he considered Christensen's job functions and public safety when

10

Appellate Case: 25-2173      Page: 20      Date Filed: 08/27/2025 Entry ID: 5552097

evaluating Christensen's ability to RTW. App.Vol. 4 at 697-98, R. Doc. 63-1, at 40:13-25 and 41:16-20; App.Vol. 7 at 1666, R. Doc. 64-1, at 2.

Call's medical opinion carries significant weight because of his extensive experience in the treatment and evaluation of post-stroke patients. App.Vol. 4 at 932-34, R. Doc. 63-5, at 2-4. Call is the Medical Director of Stroke Services at Utah Valley Hospital and sees approximately 250 stroke patients per year. App.Vol. 4 at 667, 683, R. Doc. 63-1, at 10:15-99, 26:17-23. Call served as the Chair of the Utah Stroke Task Force from 2014-2016, which ensures collaboration among leaders in stroke-care, meeting quarterly to share best practices and improve stroke-care in Utah. App.Vol. 4 at 669, 670, R. Doc. 63-1, at 12:14-17, 13:8-12.

Call has treated thousands of stroke patients and testified that when evaluating work clearances, he considers the individual's symptoms, diagnoses, and job roles as well as public safety. App.Vol. 4 at 697-98, R. Doc. 63-1, at 40:24-41:20. Call considers an individualized examination of a patient to be "of the utmost importance" and conducted such an examination of Christensen. App.Vol. 4 at 670, R. Doc. 63-1, at 13:22-25. Call explained that evaluating a stroke victim requires hands-on examination to identify brain issues, including asking the patient to do various things, like answering questions to test parts of the brain. App.Vol. 4 at 671, R. Doc. 63-1, at 14:1-9.

In evaluating Christensen's ability to return to work as a conductor, Call testified that he considered all factors that might lead to higher stroke risk. App.Vol. 4 at 707,

11

R. Doc. 63-1, at 50:18-25. While irrelevant to UP's decision to impose the five-year restrictions, Call testified that individuals who have had a stroke *can* be at a higher risk of future stroke compared to the general population, with the greatest risk occurring within 30-to-90 days immediately following the first stroke. App.Vol. 4 at 705, R. Doc. 63-1, at 48:12-18. Call also explained that medical interventions addressing the underlying cause of the initial stroke, such as atrial fibrillation, can mitigate stroke risk and return the individual to a baseline comparable to the general population. App.Vol. 4 at 706, 706-07, R. Doc. 63-1, at 49:1-12, 49:17-50:9.

Call testified that he was unaware of the FMCSA MEH and has never seen it or referred to it as authoritative in stroke literature. App.Vol. 4 at 703-04, R. Doc. 63-1, at 46:23- 47:5. Despite Call's expertise with post-stroke patients and his explicit offer to answer any questions, he has no recollection of ever being contacted by anyone representing UP regarding Christensen. App.Vol. 4 at 699, R. Doc. 63-1, at 42:2-4; App.Vol. 7 at 1666, R. Doc. 64-1, at 2.

2. **Christensen was cleared to RTW by his cardiologist, a highly qualified specialist who has treated thousands of stroke patients.**

On March 3, 2015, Dr. David Cragun ("Cragun"), Christensen's cardiologist, cleared him to RTW as an engineer and conductor without restrictions. App.Vol. 4 at 729, R. Doc. 63-2, at 13:5-16; App.Vol. 8 at 1747, R. Doc. 64-8, at 2. After examining Christensen, Cragun found "no acute neurological or cardiac conditions that yet need to be addressed." App.Vol. 3 at 427, R. Doc. 51-5, at 61.

12

Cragun is a highly qualified cardiologist, board-certified in cardiovascular and interventional cardiology, and has treated thousands of stroke patients. App.Vol. 4 at 724-25, R. Doc. 63-2, at 8:15-9:9. Cragun estimated that he sees ten atrial fibrillation patients a day. App.Vol. 4 at 725, R. Doc. 63-2, at 9:16-20. Consistent with both Call and Charbonneau's testimony, Cragun testified that a personal examination of a patient is critical to provide an opinion about the patient's fitness and allows him to gain additional information from observing physical behavior and communication beyond what the medical records provide. App.Vol. 4 at 732, R. Doc. 63-2, at 16:10-25. Cragun also testified that his standard practice is to understand and consider a patient's job duties "[b]ecause different jobs are certainly going to be affected differently by cardiac conditions, whether it's manual labor... an airplane pilot[,] train engineer or... truck driver. There are certainly different impacts on their ability to [work] or testing that may need to be done." App.Vol. 4 at 731, R. Doc. 63-2, at 15:6-18. Cragun testified that he understood Christensen worked as an engineer and conductor when clearing Christensen to work. App.Vol. 4 at 731-32, R. Doc. 63-2, at 15:1-16:9. Dr Cragun testified that while a post-stroke patient may be at a "slightly" higher risk of stroke, compared to the general population, he explained that the medical literature generally shows that "as long as an atrial fibrillation patient is on an appropriate blood thinner... his risk [of stroke] should be close to the population." App.Vol. 4 at 738, R. Doc. 63-2, at 22:14-25.

3. **Christensen's atrial fibrillation was completely and successfully treated, and he was cleared to RTW by his electrophysiologist, a second neurologist, and a family physician.**

In April 2015, Christensen's atrial fibrillation was completely treated with a successful ablation procedure with "no complications" performed by his electrophysiologist, Dr. David Wang ("Wang"). App.Vol. 8 at 1696, R. Doc. 64-6, at 17; App.Vol. 4 at 734, R. Doc. 63-2, at 18:16-18. On February 9, 2016, Wang cleared Christensen to RTW as a "Conductor" and noted Christensen's "AFib s/p ablation now in normal rhythm," and that he has "no cognitive limitations, environmental limitation, or other limitations." App.Vol. 3 at 443, R. Doc. 51-5, at 77.

In January 2016, Dr. Mohammad Enterzari-Taher ("Taher"), a specialist in neurology, also cleared Christensen to return to work, including commercial driving. App.Vol. 3 at 640, R. Doc. 62, at 23. Taher reported that Christensen had made an excellent recovery, "underwent heart ablation and now he is in normal heart rhythm[,]... [h]is balance and walking are normal[,] [h]ad some speech difficulty after stroke but it has significantly improved. His eye movements and vision are fine ... [h]e did not have seizures." App.Vol. 3 at 444, R. Doc. 51-5, at 78. Finally, while noting some slight clumsiness in his right hand, he concluded that Christensen's cranial nerve exam and motor exams presented as "normal and intact." *Id.* Taher was fully aware that Christensen worked as a conductor. *Id.*

14

4. **Christensen was cleared for his commercial driver's license by a certified FMCSA medical examiner.**

In January 2016, Dr. Wade Butaud, a certified FMCSA medical examiner and medical doctor, approved Christensen to renew his commercial driver's license ("CDL"), after a 1-year suspension following his stroke. App.Vol. 8 at 1743, R. Doc. 64-7, at 2-4; App.Vol. 8 at 1758, R. Doc. 67, at 3. This process involved an in-person examination of Christensen after full disclosure of the stroke. *Id.* Christensen had previously passed these same medical examinations for three decades prior to his stroke. App.Vol. 3 at 621, R. Doc. 62, at 4; App.Vol. 8 at 1758, R. Doc. 67, at 3. The examiner's approval of Christensen's CDL reinstatement shows that FMCSA safety standards did not prevent Christensen from returning to safety-sensitive work.

C. **UP permanently ended Christensen's career when it imposed restrictions based on a new blanket policy and denied his RTW in 2016, 2018, and 2020.**

The record is clear that after the initial 1-year restriction, Christensen was able to safely RTW. In fact, Holland acknowledged in 2016 that Christensen's ablation procedure had been successful and Christensen "remained free of atrial fibrillation." App.Vol. 3 at 485, R. Doc. 51-5, at 119. Charbonneau, too, admitted that Christensen satisfied the threshold RTW requirements and had no recurring events prior to the 1-year return. App.Vol. 4 at 905, R. Doc. 63-4, at 37:2-25. Charbonneau testified that Christensen's ejection fraction, which was 50%, was above the threshold cutoff and considered "normal." App.Vol. 4 at 892-93, R. Doc. 63-4, at 24:23-25:1. Christensen

15

was ready and able to RTW after the 1-year restriction, as even an FMCSA certified medical examiner determined in January 2016. Christensen complied with UP's RTW instructions, obtaining an updated neurological examination and submitting all requested medical records. App.Vol. 3 at 540, R. Doc. 51-7, at 10; App.Vol. 3 at 444-46, R. Doc. 51-5, at 78-80.

However in early 2016, Holland informed Christensen that his restrictions would remain in place for 5-years pursuant to a new blanket policy, explaining "that when HMS originally placed work restrictions on [Christensen] in 2015, it was [UP's] common practice to keep these in place for only... one year" but that UP had since adopted a new blanket policy and "now require[s] a 5-year minimum waiting period after such brain injuries due to risk for seizures." App.Vol. 3 at 487, R. Doc. 51-5, at 121; App.Vol. 3 at 530, R. Doc. 51-6, at 6.

Following this abrupt determination in early 2016, Holland went through the motions of a formal FFD evaluation based on Christensen's updated medical records, which contained the findings and recommendations of Christensen's treating physicians, many of whom are specialists. However, contrary to all findings and recommendations contained in these records, Holland concluded in March 2016 that a 5-year restriction should be imposed, the exact same conclusion he expressed prior to reviewing any of Christensen's updated records in December 2015. App.Vol. 8 at 1757, R. Doc. 67, at 2; App.Vol. 3 at 537, R. Doc. 51-7, at 7.

16

In February 2018, Christensen—on the advice of his union representative—requested an early re-evaluation of his work restrictions. Charbonneau reviewed the 2016 FFD evaluation and updated medical records but found "no basis to change or remove" the existing restrictions. *Id.* at 2-3; App.Vol. 3 at 583, R. Doc. 51-11, at 2. Christensen had remained free from atrial fibrillation and had not experienced any recurrent strokes and never experienced a seizure. But still, upholding Holland's off-the-rack 5-year restriction, Charbonneau denied Christensen's reassessment and stated that Christensen "is approximately 15-months from a potential [RTW] if all the conditions addressed are treated and controlled, stable/resolved. He should start scheduling [follow-up] visits for the condition in late 2019, for [RTW] consideration... in January of 2020[.]" App.Vol. 3 at 533, R. Doc. 51-7, at 3. Christensen followed these exact instructions, again, in 2020.

After the 5-year restrictions ended, Christensen followed UP's procedures and submitted the required medical records to RTW. App.Vol. 8 at 1758, R. Doc. 67, at 3. According to UP's new Chief Medical Officer, Dr. Laura Gillis, UP "wait[s] for the employee to reach out actively to us for any sort of reconsideration request." App.Vol. 5 at 1154, 1160, R. Doc. 63-8, at 12:9-20, 18:6-16. Christensen reached out, but UP did not respond. While UP denies having received Christensen's inquiry in 2020, Gillis admitted she was unsure what happened to the records Christensen faxed in 2020 and acknowledged that UP's outdated technology often results in lost

17

documents. App.Vol. 5 at 1152, 1168, R. Doc. 63-8, at 10:11-18, 26:18-21. Christensen received no communication from UP about his RTW until July 2024, after his deposition and at the apparent suggestion of counsel, UP invited him to resubmit his medical records. App.Vol. 5 at 1150, 1161, R. Doc. 63-8, at 8:9-18, 19:13-20; App.Vol. 5 at 1183, R. Doc. 63-9, at 2. By then, Christensen was close to retirement and had lost trust in UP, so he did not pursue the belated offer. App.Vol. 8 at 1759, R. Doc. 67, at 4.

Holland documented his determination that Christensen was "permanently disabled from [his] regular occupation" due to, as he later clarified, an alleged seizure risk. App.Vol. 5 at 1106-07, R. Doc. 63-7, at 34:23-35:1. Christensen's risk of recurrent stroke, if any, was not a factor in Holland's 2016 FFD, which was based on a purported risk of seizure. App.Vol. 4 at 851, R. Doc. 63-3, at 110:16-25. Christensen had never—and still has never—experienced a seizure. App.Vol. 8 at 1759, R. Doc. 67, at 4. There is also no objective evidence that Christensen had a heightened seizure risk, and as UP even admitted, "accurately forecasting or quantifying Christensen's seizure risk is nearly impossible." App.Vol. 1 at 79, R. Doc. 50, at 28. UP's retained neurologist and expert witness, Dr. Pierre Fayad ("Fayad"), testified it is well-agreed upon that "[e]arly seizures in the first 2 weeks after stroke significantly increase the risk of later seizures [and t]he greatest risk of seizures after ischemic stroke [occurs] in the first year." App.Vol. 4 at 805, R. Doc. 63-3, at 64:6-9. While it is "nearly

18

impossible" to "forecast[] or quantify[]," Christensen's low risk of seizure bears out in that he has *never* experienced a seizure. App.Vol. 5 at 1062-63, **R. Doc. 63-6**, at 127:16-128:4; App.Vol. 8 at 1759, **R. Doc. 67**, at 4; App.Vol. 1 at 79, **R. Doc. 50**, at 28. The only reason Christensen was given for why he was not allowed to return to work after one year as he was first promised was UP's new policy. App.Vol. 4 at 915, **R. Doc. 63-4**, at 47:4-25.

The testimony in the record materially undermines UP's application of the 5-year restriction to Christensen based on an assumed risk of seizures. UP's expert neurologist, Fayad, testified to the importance of actual contact with the patient; that any analysis of deficits following a stroke requires a 360-degree review, including the perspective of the patient and their family. App.Vol. 4 at 775-77, **R. Doc. 63-3**, at 34:4-36:21. When asked whether any deficits prevented Christensen from performing his job in 2016, Fayad stated, "I don't know. Again, I didn't examine him... I don't have a way to directly evaluate that." App.Vol. 4 at 862, **R. Doc. 63-3**, at 121:1-13. However, Holland did not consult any stroke experts or refer Christensen for additional assessments like neurocognitive testing or a functional capacity evaluation. App.Vol. 5 at 1098, **R. Doc. 63-7**, at 26:1-25.

There is no evidence that Holland relied on his training as an occupational doctor for UP when imposing the blanket five-year restriction on Christensen. Unlike Christensen's treating physicians, Holland is not a specialist in post-stroke medicine.

19

Apparently recognizing a lack of specialized expertise in critical areas, Charbonneau testified that "presumably a neurologist's opinion-excuse me- findings, clinical findings would be correct." App.Vol. 4 at 909, **R. Doc. 63-4, at 41:21-23.** Even UP's retained neurologist and expert witness, Fayad, testified that he looks to the specialized treating physicians' determination of any ongoing deficits and recommended work restrictions following a stroke. App.Vol. 4 at 778, **R. Doc. 63-3, at 37:4-14.** But UP's internal doctors did not attempt to consult with Christensen's neurologists or cardiologist during the FFDs. App.Vol. 4 at 887, **R. Doc. 63-4, at 19:14-21;** App.Vol. *5* at 1078, **R. Doc. 63-7, at 6:13-19.** Holland's experience similarly does not support the blanket *5*-year restriction, as he testified that he was unaware of *any* instances in which an employee returned to work after 6-months or 1-year work restrictions post-stroke and subsequently experienced a sudden incapacitation event that hurt someone. App.Vol. *5* at 1107, **R. Doc. 63-7, at 35:4-11.** However, despite having far less information and expertise than Christensen's physicians, Holland applied the *5*-year restrictions. UP's off-the-rack policy had very real consequences for Christensen as it permanently, and prematurely, ended his career.

**D.** **UP's off-the-rack policy adopts a misguided interpretation of an obsolete handbook for a different industry.**

It is undisputed that Holland's decision to extend Christensen's restriction was solely attributed to UP's new blanket policy, adopted from the discontinued 2014 FMCSA medical examiner's handbook ("MEH"), containing obsolete

Appellate Case: 25-2173     Page: 30     Date Filed: 08/27/2025 Entry ID: 5552097

recommendations for the commercial driving industry. *See* App.Vol. 6 at 1186, **R. Doc. 63-10, at 2.** Holland claimed, without any evidence, that the **FFD** determination and the blanket policy are "consistent with the most recent scientific evidence, and with the current medical guidance of **FMCSA**—which **HMS** considers reasonable to apply to all railroad workers in safety critical positions." App.Vol. 3 at 530, **R. Doc. 51-6, at 6.** However, the record thoroughly demonstrates that it was *not* consistent with the most current scientific evidence nor the then-current guidance of the **FMCSA** in 2016. App.Vol. 3 at 586, **R. Doc. 61, at 3.** Holland relied on the **MEH** even though, as he testified, it was well-known within the occupational medicine field that the **FMCSA** removed the **MEH** from its website because of its obsolescence and improper broad-brush guidance. App.Vol. 7 at 1544-46, 1548-49, **R. Doc. 63-12, at 28:16-30:1, 32:6-33:11.**

The **MEH** was written for the commercial driving industry, not the railroad. The **MEH**, prior to being explicitly retired, offered a set of *recommendations* designed to *assist* certified medical examiners in determining whether an applicant for a **CDL** is medically qualified and safe to drive commercially. App.Vol. 6 at 1210, **R. Doc. 63-10, at 26.** The **MEH** recommended a 1-year restriction if the driver's stroke did not produce an increased seizure risk and recommended a 5-year restriction period only if the person's stroke puts them at an increased seizure risk on an ongoing basis. App.Vol. 6 at 1331, **R. Doc. 63-10, at 145.** However, the **FMCSA** withdrew the

21

MEH by 2015 because, according to the official notice, the MEH contained "information [that] was obsolete or... prescriptive in nature." 87 FR 50282 ("Qualifications of Drivers: Medical Examiner's Handbook and Medical Advisory Criteria Proposed Regulatory Guidance"). Dr. Brian Morris ("Morris"), a member of the FMCSA Medical Review Board who has served as a retained expert witness for UP in related litigation, testified that the FMCSA removed the 2014 MEH from its website because the MEH was improperly being treated as mandatory versus optional guidance; and the MEH contained medical information that had been gathered from as far back as the 1980s and needed to be updated. App.Vol. 7 at 1479-82, 1485-86, 1502-03, R. Doc. 63-11, at 32:24-35:13, 38:5-39:8, 55:20-56:5. Even Dr. Call, a leading specialist in stroke medicine, was unaware of the MEH and does not, and has never, considered it as authoritative in stroke literature. *Supra* at 14.

To make this obsolescence clear, the FMCSA also placed a watermark on *each* page of the 2014 handbook stating, "No longer in use," and on the front page, "As of 2015 this Handbook is no longer in use." App.Vol. 6 at 1187, R. Doc. 63-10, at 3.

Appellate Case: 25-2173    Page: 32    Date Filed: 08/27/2025 Entry ID: 5552097



8:23-cv-00268-RFR-MDN   Doc # 63-10   Filed: 02/28/25   Page 3 of 262 - Page ID # 1539

RCHRISTENSEN0000559

**NATIONAL REGISTRY OF CERTIFIED MEDICAL EXAMINERS**

**Federal Motor Carrier Safety Administration (FMCSA)**

**Medical Examiner Handbook**

No longer in use

DEPARTMENT OF TRANSPORTATION · UNITED STATES OF AMERICA

As of 2015 this Handbook is no longer in use

App.Vol. 6 at 1187, R. Doc. 63-10, at 3.

The FMCSA did so because "they don't want people to go online, download it and think they should be using the [MEH] guidelines... as if it had not been pulled from the Internet." App.Vol. 7 at 1488, R. Doc. 63-11, at 41:9-22. The FMCSA's decision to retire the MEH was communicated widely, and Holland was aware that the FMCSA removed the MEH from its website by at least September 2015. App.Vol. 7 at 1544, 1546-48, 1608, R. Doc. 63-12, at 28:10-15, 30:16-32:2, 92:5-9; App.Vol. 8 at 1749, R. Doc. 64-9, at 2. Holland also acknowledged that it was well-known within the occupational medicine field that the FMCSA had removed the MEH from its website. App.Vol. 7 at 1544-46, 1548-49, R. Doc. 63-12, at 28:16-30:1, 32:6-33:11.

Nevertheless, Holland ignored the FMCSA's warning that certification determinations should be based on individualized, case-by-case evaluations rather than blanket policies. Instead, Holland claimed it was reasonable to apply a blanket

23

5-year period to "all railroad workers in safety critical positions" and continued to use the MEH as a prescription for his FFD determinations for several more years. App.Vol. 7 at 1547-48, R. Doc. 63-12, at 31:9-32:2; App.Vol. 3 at 487-48, R. Doc. 51-5, at 121-22. Holland explained in his FFD memo that:

> HMS considers [the FMCSA] recommendations... to be evidence-based, and to well characterize risks for sudden incapacitation for works *[sic]* in other safety critical positions (such as, a Trainman) where the function *[sic]* job requirements and safety risks are substantially similar to those of a commercial driver.

App.Vol. 3 at 528, R. Doc. 51-6, at 4.

However, Christensen was approved, after a full physical examination by a physician and certified FMCSA medical examiner, to return to commercial driving in early 2016, which all but proves that UP's 5-year restriction was unsupported by these guidelines. App.Vol. 8 at 1758, R. Doc. 67, at 3; App.Vol. 8 at 1743-45, R. Doc. 64-7, at 2-4. Holland knew that Christensen obtained his CDL—the very thing that the MEH was written to control—and thus knew that Christensen met the safety-standards that UP claims to follow. App.Vol. 3 at 649, R. Doc. 62, at 32. If Holland is right that the FMCSA guidelines "well characterize risks" for workers like Christensen with "job requirements and safety risks [that] are substantially similar to those of a commercial driver," Christensen was safe to RTW in 2016. App.Vol. 3 at 528, R. Doc. 51-6, at 4.

Appellate Case: 25-2173     Page: 34     Date Filed: 08/27/2025 Entry ID: 5552097

**E.** The district court granted summary judgment for UP on the fact-intensive affirmative direct-threat defense and Christensen appeals.

Christensen filed suit against UP on June 16, 2023, seeking damages resulting from its violation of the ADA, 42 U.S.C. § 12101 *et seq.,* as amended. App.Vol. 1 at 11, R. Doc 1, at 1. UP's Answer asserted affirmative defenses, including the direct-threat defense. App.Vol. 1 at 50, R. Doc. 6, at 12; 42 U.S.C. §§ 12111(3), 12113(b); 29 C.F.R. § 1630.2(r). UP moved for summary judgment, arguing that Christensen cannot prove his ADA claim or alternatively, that UP's discriminatory actions were justified by the direct-threat defense. App.Vol. 1 at 74-83, R. Doc. 50, at 23-32. UP argued that because of his stroke in 2015, Christensen "posed a direct threat to health and safety" that could not be mitigated by reasonable accommodation and that it "made an objectively reasonable medical decision" in imposing the five-year work restriction on Christensen *Id.*

Christensen opposed summary judgment on the grounds that UP omits critical facts and relies on arguments precluded by this Court's precedent in *Sanders.* 108 F.4th at 1064.[3] App.Vol. 3 at 584, R. Doc. 61, at 1. Christensen's brief in opposition highlights the many material facts in dispute. A jury could reject the direct-threat defense by noting that Christensen's physicians and records contradicted UP's blanket

---

[3] Briefing predated this Court's decision in *Werner,* which now provides additional support for Christensen's position. 142 F.4th 1122.

Appellate Case: 25-2173     Page: 35     Date Filed: 08/27/2025 Entry ID: 5552097

5-year restriction, which was unsupported even by FMCSA guidelines and should have ended in January 2016. App.Vol. 3 at 584-85, R. Doc. 61, at 1-2. Christensen emphasized the weight of UP's burden in proving the direct-threat affirmative defense and the misplaced attempt to do so at summary judgment. *Id.* at 25-26, n. 10 (citing the many cases that "have considered—and rejected—[UP]'s direct threat affirmative defense in similar cases in recent years").[4]

On May 23, 2025, the United States District Court for the District of Nebraska, Chief Judge Rossiter, Jr., granted summary judgment to UP on its direct-threat affirmative defense and dismissed Christensen's ADA claim with prejudice. App.Vol. 8 at 1886, R. Docs. 74, at 13; App.Vol. 8 at 1890, R. Doc. 75, at 1. On June 12, 2025, Christensen filed a timely appeal to this Court. App.Vol. 8 at 1891, R. Doc. 76, at 1.

---

[4]Since briefing, numerous decisions from this Court and others have denied summary judgment on direct-threat affirmative defenses in similar cases. *See e.g.*, *Werner*, 142 F.4th at 1133; *Mayer v. Union Pac. R.R. Co.*, 8:23CV225, 2025 WL 1827621 at *17 (D. Neb. July 2, 2025). These decisions aptly confirm summary judgment is inappropriate here.

Appellate Case: 25-2173     Page: 36     Date Filed: 08/27/2025 Entry ID: 5552097

# SUMMARY OF ARGUMENT

**I.** UP is not entitled to summary judgment on its fact-intensive, direct-threat affirmative defense. This Court's recent decisions in *Werner* and *Sanders* confirm that the direct-threat defense is a high bar and places a heavy burden on the employer. UP has not met its burden. The district court's contrary analysis and conclusion demands reversal.

**IA.** This Court reviews a grant of summary judgment *de novo*. Summary judgment is proper only if the movant shows there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a) (summary judgment is inappropriate unless "there is no genuine dispute as to any material fact").

**IB.** The district court distorted the direct-threat affirmative defense, the standard for summary judgment and the factual record. The district court ignored *Sanders* and instead decided, based on erroneous interpretations of both law and facts, that no triable issue on UP's direct-threat defense existed. In doing so, it reached the wrong result with the wrong approach. The district court's errors are numerous.

**IB.1.** The court's analysis reflects a fundamental misunderstanding of the high bar the direct-threat affirmative defense requires at any stage of litigation, and particularly at summary judgment. The district court's reliance on the Sixth Circuit's *Michael* decision is misguided and contrary to the approach taken by this Court, as

27

well as the Seventh, Ninth, Tenth, and Eleventh Circuits. The district court's erroneous analysis cannot be reconciled with this overwhelming precedent.

**IB.2.** The court also applied the wrong standard of review by overlooking disputed facts and drawing inferences in UP's favor. The Fed. R. Civ. P. 56(a) standard was not met here, as the district court itself recognized that there existed "tricky questions." The court erred in granting summary judgment in the face of these disputed facts and "tricky questions."

**IB.3.** The district court's approach eviscerates the protections the ADA is designed to guarantee and distorts the direct-threat defense beyond recognition. The district court disregarded Congress's clear intent and conducted a shallow analysis that granted UP an ill-founded excuse to discriminate. This is exactly what the ADA was enacted to prevent.

**IC.** *Werner* and *Sanders* apply straightforwardly here and confirm that UP failed to satisfy its heavy burden at summary judgment because genuine fact issues exist on whether its direct-threat determination relied on an individualized assessment, was objectively reasonable, and based on the best objective evidence and/or most current medical knowledge.

**IC.1.** UP's blanket 5-year restrictions policy does not constitute an individualized assessment under the direct-threat defense. *Werner,* 142 F.4th at 1133 (affirming the rejection of employer's direct-threat defense as a matter of law because

28

the "one-size-fits-all approach" *cannot* sustain the defense). The mere fact that UP's blanket policy imposes a 5-year restriction on *any employee* who has or had a condition that UP suspects may create some elevated risk of sudden incapacitation, precludes summary judgment here.

1C.2. A jury could determine, based on controverted testimony, that UP's determinations were not objectively reasonable. In *Sanders*, this Court held that the record properly supported the jury verdict rejecting UP's direct-threat defense. Like in *Sanders*, the controverted medical testimony regarding the reasonableness of UP's reliance on the outmoded MEH guidance and the reasonableness of the direct-threat determination itself, creates fact issues that cannot be resolved on summary judgment. *Sanders*, 108 F.4th at 1064.

Even if reliance on the FMCSA's then-current guidance was reasonable, although it was not, UP's interpretation was neither reasonable nor consistent with the FMCSA guidance. A certified FMCSA medical examiner approved Christensen for his CDL in 2016, one year after his stroke. Holland knew this. This confirms that the 5-year restriction imposed on Christensen was not reasonably based on the FMCSA's then-current standards. These facts alone preclude summary judgment on UP's direct-threat affirmative defense.

1C.3. UP failed to prove as a matter of law that it relied on the best objective evidence and/or most current medical knowledge. The undisputed evidence that

Appellate Case: 25-2173     Page: 39     Date Filed: 08/27/2025 Entry ID: 5552097

Holland was aware that the MEH had been withdrawn and contained obsolete mandatory guidance, is enough for a jury to reject UP's defense in its entirety.

This Court should reverse the district court's order and remand for a jury trial to resolve the fact issues.

Appellate Case: 25-2173    Page: 40    Date Filed: 08/27/2025 Entry ID: 5552097

# ARGUMENT

## I. The district court took the wrong approach and reached the wrong result in granting summary judgment for UP on the direct-threat affirmative defense.

Substantial authority from this Circuit and others confirm that the district court erred in granting UP's motion for summary judgment. The record presents "tricky questions" that—when viewed in a light most favorable to Christensen—create genuine fact issues. App.Vol. 8 at 1886, R. Doc. 74, at 13. These fact issues prevent UP from prevailing on its direct-threat defense at the summary judgment stage.

Under this Court's precedent, UP hardly has enough evidence to prove its direct-threat affirmative defense *to a jury*, let alone *as a matter of law*. *Werner*, 142 F.4th at 1133; *Sanders*, 108 F.4th at 1064; *Turner*, 149 F.3d at 824. This Court should reverse summary judgment and remand this case for a jury.

### A. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Wealot v. Brooks*, 865 F.3d 1119, 1124 (8th Cir. 2017). The movant bears the burden of proving that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* At this stage, this Court views "the evidence in the light most favorable to the non-moving party," *id.*, and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The court cannot weigh evidence or make credibility determinations at this stage. *Torgerson v. City of*

31

*Rochester*, 643 F.3d 1031 (8th Cir. 2011) (*en banc*); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Summary judgment is inappropriate where a genuine issue—that is, an issue that could lead a reasonable jury to return a verdict in favor of the nonmoving party—exists. *Becker v. City of Hillsboro*, 125 F.4th 844 (8th Cir. 2025); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (If "reasonable minds could differ as to the import of the evidence," summary judgment is not warranted).

When a defendant moves for summary judgment on an affirmative defense for which it bears the burden of proof, the already high bar for summary judgment is elevated. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). Because of this, "summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998). Here, UP bears this higher burden on its direct-threat affirmative defense. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2007) ("[T]the employer bears the burden of proof [on] the direct threat defense"). If the record shows there is a genuine issue for trial, this Court should reverse summary judgment and remand the case for a jury.

### B. The district court's erroneous analysis cannot be reconciled with controlling precedent, the standard for summary judgment, or the factual record.

Fact-intensive affirmative defenses are ill-suited for summary judgment. UP's direct-threat affirmative defense is no exception. The direct-threat defense is a narrow exception to the ADA's prohibition on disability discrimination; it is not a loose

32

justification an employer can use to escape liability for prohibited conduct. But the district court's flimsy direct-threat analysis, improper resolution of controverted evidence in UP's favor distorts the direct-threat defense from an exception to a loose justification. The district court held:

> [UP] thoroughly reviewed [Christensen's] medical records and reached a reasonable medical judgment based on their own medical knowledge and the available evidence.
>
> * * *
>
> [W]hether one doctor is right that an employee can safely perform his job... or another doctor is right that the employee cannot, will be unknowable... The inherent medical uncertainty about stroke and seizures does not categorically bar the direct-threat defense...

App.Vol. 8 at 1887-88, **R. Doc. 74**, at 14-15.

The district court erred in reaching this conclusion and should be reversed for the following reasons.

1. **The district court's analysis reflects a fundamental misunderstanding of the high bar that the fact-intensive direct-threat affirmative defense requires at summary judgment.**

The district court skipped any meaningful scrutiny of UP's direct-threat affirmative defense and instead decided conflicting evidence in UP's favor. In the process, the district court confused the question raised by UP's motion for summary judgment. It is true that disagreement among doctors and "medical uncertainty" may not "categorically bar the direct-threat defense" altogether. *Id.* But this is summary judgment. The question was not whether anything categorically bars the direct-threat defense *altogether*. The only relevant question—one that the district court failed to

33

ask—is whether conflicting testimony and "medical uncertainty" categorically bars UP from proving its direct-threat defense *at summary judgment, as a matter of law*. The answer is yes.

To succeed on the direct-threat defense at summary judgment, UP needs to establish its defense to a certainty in which no reasonable jury could disagree. *Becker*, 125 F.4th at 844; *Baldwin v. Union Pac. R.R. Co.*, _F.4th_, 2025 WL 2179316 at *4. And because a jury is not required to accept the employer's controverted testimony, it is not merely a "certainty" that "Christensen *thinks* [UP] needs," it is what the law *demands* at summary judgment. App.Vol. 8 at 1887, R. Doc. 74, at 14 (emphasis added); *Wealot*, 865 F.3d at 1128. Conflicting testimony thus precludes summary judgment on UP's defense. *Baldwin*, _F.4th at *5 (8th Cir. Aug. 1, 2025) ("[C]onflicting expert opinions on... [direct-threat], create[es] a [jury] question...").

The district court's upside-down approach sidesteps UP's heavy burden by suggesting that Holland's "own medical knowledge and the available evidence" was all that the defense requires. The court merely assumed that UP's determination was objectively reasonable, App.Vol. 8 at 1887, R. Doc. 74, at 14, crediting Holland's testimony over that of Christensen's treating physicians. This approach distorts the defense into simply requiring reliance on *any* medical opinion, rather than the "most current medical knowledge" and/or the "best available objective evidence" *Sanders*, 108 F.4th at 1062. The court relied heavily on *Michael v. City of Troy Police Dep't.*

34

in erroneously concluding that disagreement among doctors does not make UP's decision unreasonable. 808 F.3d 304, 309 (6th Cir. 2015). In *Michael,* the Sixth Circuit held that "[a]n employer's [direct-threat] determination... is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable" and explained that a medical opinion *can be* objectively reasonable even if it conflicts with other medical opinions. *Id.* at 309. But this flawed logic is unpersuasive.[5]

The key issue is whether UP's determination is reasonable as a matter of law, not just potentially reasonable. A jury's ability to find UP's determination reasonable does not obligate it to do so. Accordingly, under this Court's controlling precedent, the opinion of one of UP's internal occupational doctors "does not insulate [UP] from [ADA] liability." *Sanders,* 108 F.4th at 1061; *Werner,* 142 F.4th at 1133 (confirming that employers bear a heavy burden in even raising the direct-threat defense); *Wal-Mart,* 477 F.3d at 572.

---

[5] The majority's unpersuasive reasoning is aptly refuted by the dissent: "[T]he issue in this case... is whether the opinions... on which the [employer] relied were objectively reasonable in the first place. The record... does not one-sidedly demonstrate as a matter of law a disagreement between two sets of objectively reasonable opinions... Instead, [it] call[s] into question whether [the opinion and the employer's reliance on that opinion] was objectively reasonable at all." *Michael,* 808 F.3d at 314 (Gilman, J. dissenting).

35

The district court's approach circumvents the scrutiny required by the fact-intensive "objectively reasonable," "most current," and "best available" qualifiers, which place a premium on the jury function and necessarily require scrutiny of both the employer's determination and the information the employer relied on. *Berner v. Metro. Council*, 2023 WL 3343943, at *4 (D. Minn. May 10, 2023) ("[M]edical opinions derived from an arbitrary or unreasonable medical assessment process are not better than the process that yielded those opinions in the first place. Arbitrariness or unreasonableness calls into question the whole process, fruit and vine."). Moreover, it is for a jury, not the court, to resolve these questions. *Micone v. Levering Reg'l Health Care Ctr., LLC*, 132 F.4th 1074, 1078 (8th Cir. 2025); 8th Cir. Model Jury Instr. § 9.61; *Sanders*, 108 F.4th at 1062; *Baker v. Union Pac. R.R. Co.*, 580 F.Supp.3d 647, 660 (D. Neb. 2022) ("It is not the Court's function on summary judgment to resolve conflicting expert testimony.").

Other circuits take a similar approach. The Tenth Circuit explained in *Justice v. Crown Cork & Seal Co.*, that "to hold that one cannot second-guess an employer's [determination] would eviscerate the ADA's protections by permitting the employer to assert [the direct-threat defense] in nearly every case" of discrimination. 527 F.3d 1080, 1092 fn.5 (10th Cir. 2008) (finding a jury question on whether employer's "application of the medical judgments... was unreasonable"). The Ninth Circuit confirmed that specialist opinions disputing internal medical opinions create jury

36

questions. *Echazabal v. Chevron USA, Inc.,* 336 F.3d 1023, 1027-28 (9th Cir. 2003). Similarly, the Seventh Circuit recognized that juries may reject or discount an employer's evidence in assessing direct-threat defenses. *Stragapede v. City of Evanston,* 865 F.3d 861, 867 (7th Cir. 2017). The Fifth Circuit, too, has confirmed that conflicting evidence on the direct-threat defense creates a jury question. *E.E.O.C. v. E.I. Du Pont de Nemours & Co.,* 480 F.3d 724, 730–31 (5th Cir. 2007).

Because the direct-threat defense requires such a fact-intensive inquiry, it is ill-suited for summary judgment. As articulated by the Fifth Circuit, "[w]hether one is a direct threat is a complicated, fact intensive determination, not a question of law... [it is] for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm." *Rizzo,* 84 F.3d at 764 (fact issue precluded summary judgment on direct-threat). The Fourth, Sixth and Tenth Circuits have adopted a similar sentiment.[6] *See Lissau v. Southern Food Service, Inc.,* 159 F.3d 177, 184 (4th Cir. 1998) (explaining that "when the reasonableness of conduct is in question, summary judgment is rarely appropriate because juries have unique competence in applying the reasonable person standard to the facts of the case");

---

[6] The district court's approach here is also inconsistent with other district courts in this Circuit. App.Vol. 8 at 1798-1803, R. Doc. 69-1, at 35-40 ("*Hurd* Order") (finding jury questions where treating physician cleared plaintiff to work and did not believe that Plaintiff posed a safety threat); *Baker,* 580 F.Supp.3d at 660 (confirming conflicting physician testimony precludes summary judgment); *Mayer,* 2025 WL 1827621 at *17 (same).

Appellate Case: 25-2173     Page: 47     Date Filed: 08/27/2025 Entry ID: 5552097

*Hamlin v. Charter Tp. of Flint*, 165 F.3d 426, 431–32 (6th Cir. 1999) (confirming direct-threat was a jury question); *Osborne*, 798 F.3d at 1278 (faulting a lack of evidence in the record of whether or how often alleged safety-events may occur).

Summary judgment is not a shortcut for escaping ADA liability under the direct-threat defense and the district court's contrary approach is improper.

### 2. The district court misstated the facts and improperly resolved genuine disputes in favor of UP.

The district court erred by improperly weighing evidence in granting summary judgment against Christensen. Under the Supreme Court's binding precedent, the district court was required to interpret the record in a light most favorable to Christensen and disregard all evidence favorable to UP "that the jury is not required to believe." *Reeves*, 530 U.S. at 151; *Anderson*, 477 U.S. at 355 ("Credibility determinations, weighing... the evidence, and... drawing... legitimate inferences from the facts are jury functions, not those of a judge."). *Wealot*, 865 F.3d at 1128 (reversing summary judgment because "[d]isputed factual issues and conflicting testimony should not be resolved by the district court.").

Instead, the district court adopted incorrect interpretations of material facts. The court's statement that "Christensen neither challenges the currency or quality of the evidence the HMS considered" is boldly incorrect. App.Vol. 8 at 1887, R. Doc. 74, at 14. Christensen expressly argued that the MEH "is *neither current* medical knowledge *nor pertinent guidance.*" App.Vol. 3 at 614, R. Doc. 61, at 31 (emphasis

38

added). The court even acknowledged elsewhere that "[Christensen] *asserts that some of the medical information [the MEH] contains is outdated.*" App.Vol. 8 at 1877, R. Doc. 74, at 14. But the MEH was withdrawn by the FMCSA <u>in its entirety</u>, not merely "some of the medical information." *Id.* (emphasis added). The court's assumption that the MEH constituted the best objective—and most current—medical evidence is error because the MEH's applicability and currency are materially disputed in the record and a reasonable jury could accept Christensen's position on these issues.[7]

### 3. The district court's approach eviscerates the protections the ADA is designed to guarantee.

The district court's approach bypasses the guardrails on the direct-threat defense and subverts the ADA's "sweeping purpose" of "eliminat[ing] discrimination against disabled individuals." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675 (2001); *see also* ADA Amendments Act of 2008 ("ADAAA") (expanding the broad protections). This Court's precedents echo the importance of protecting individuals from discrimination based on prejudice, stereotypes, or unfounded fears. *Werner,*

---

[7] UP has already sought to capitalize on the district court's error here, inviting other courts to repeat this same error in similar ADA cases. *See Granas v. Union Pacific R.R. Co.,* 1:21-cv-00116-AA, No. 121 (June 9, 2025) (UP arguing that disagreement among doctors and controverted testimony "is hardly proof that defendant's doctors were unreasonable... That's why the court in *Christiansen* [*sic*]... granted summary judgment... despite the contrary views of... treating physicians").

Appellate Case: 25-2173     Page: 49     Date Filed: 08/27/2025 Entry ID: 5552097

142 F.4th at 1133; *Sanders*, 108 F.4th at 1062; *Wal-Mart*, 477 F.3d at 571. The district court's rationale permits the very discrimination the ADA exists to prevent.

The ADA established an expansive rule prohibiting disability discrimination. The direct-threat affirmative defense is a narrow exception to this rule, allowing an employer to justify conduct if it can demonstrate that an employee posed a significant risk of substantial harm to health or safety that cannot be eliminated or reduced by reasonable accommodation. *Sanders*, 108 F.4th at 1062; 29 C.F.R. § 1630.2(r). To satisfy this defense, the employer must affirmatively prove that it relied on an individualized and objectively reasonable assessment based on the best objective evidence and most current medical knowledge. *Id.* The determination must also consider specific factors like the "duration of risk" and "nature[,] severity," "likelihood," and "imminence of the potential harm." *Wal-Mart*, 477 F.3d at 571. An employer cannot use vague, poorly established, or hypothetical risks to avoid ADA liability under this defense, and even a "slightly increased risk is not enough to constitute a direct threat... there must be a high probability of substantial harm." *E.E.O.C. v. Hibbing Taconite Co.*, 720 F.Supp.2d 1073, 1082 (D. Minn. 2010); 29 C.F.R. § 1630.2(r).

The direct-threat defense's demanding standard safeguards the ADA by preventing employers from misusing the defense and ensuring this narrow exception does not swallow the general ADA rule. This is especially true at summary judgment,

40

because "[p]ermitting employers to obtain summary judgment by identifying... unlikely [safety] scenarios would eliminate ADA protection for disabled individuals working in [safety-sensitive] professions." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1278 (10th Cir. 2015); *Rizzo*, 84 F.3d at 764 ("[D]irect threat is a complicated, fact intensive determination" for the "the trier of fact to determine after weighing all the evidence"). However, the district court's analysis bypasses these guard rails and distorts the direct-threat affirmative defense into a general rule rather than a narrow exception to the rule. Under the court's analysis, an employer can evade ADA scrutiny merely by *claiming* that its discriminatory conduct was based on safety concerns. This is error.

C. Under this Court's binding precedent in *Werner* and *Sanders,* UP is not entitled to summary judgment on its fact-intensive, direct-threat defense.

At summary judgment, UP must do more than simply identify evidence supporting its defense; it must demonstrate that the evidence was so one-sided that no reasonable jury could resolve the defense in Christensen's favor.

Under the direct-threat defense, UP must prove Christensen posed a significant risk of *substantial* harm to health or safety that cannot be eliminated or reduced by reasonable accommodation, in 2016, 2018 and 2020. *Sanders,* 108 F.4th at 1062; 29 C.F.R. § 1630.2(r). To do so, UP is required to demonstrate that each direct-threat determination was: (1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the best objective and most current medical evidence.

41

*Id.* This must also specifically consider "the duration[,] nature[,] severity[,]... likelihood... [and] imminence of the potential harm." *Wal-Mart*, 477 F.3d at 571. The record does not show that UP's determinations meet these fact-intensive requirements with any certainty.

*Werner* and *Sanders* confirm that a reasonable jury could find in favor of Christensen on UP's direct-threat defense by concluding that UP's determinations were not the result of an individualized assessment, not objectively reasonable, or not based on the best objective medical evidence. In both, this Court upheld the rejection of the employers' direct-threat defense. *Id.* at 1062.

*Werner* clarifies the heavy burden on the employer in raising a direct-threat affirmative defense and emphasizes that generalized assumptions or blanket policies cannot satisfy the individualized assessment requirement under this defense. This Court scrutinized and ultimately rejected the employer's defense, as a matter of law, affirming that the direct-threat defense is a high bar to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Werner*, 142 F.4th at 1133 (citation omitted). The employer's threat assessment failed because, as this Court explained, "[e]ven viewing the facts in the light most favorable to [the employer], it is undisputed that [employer] did not conduct the individualized analysis necessary to prove this affirmative defense: [it] just made a few general calls to back up... 'prejudice, stereotypes, [and] unfounded fear' of allowing a [disabled] individual

42

to drive [employer's] truck." *Id.* This Court rejected the employer's "off-the-rack" evaluation and held that "one-size-fits-all" approaches are "insufficient"—as a matter of law—to sustain the direct-threat defense. *Id.* at *6.

*Sanders* similarly confirms that the direct-threat defense is a fact-intensive defense that a jury can reasonably reject based on controverted facts and testimony in the record. *Sanders*, 108 F.4th at 1062. *Sanders* made it to a jury, which held for the employee. This Court upheld the jury's finding that UP's determination was not objectively reasonable and did not rely on the best available objective evidence or most current medical knowledge. *Id.* at 1064. The jury's rejection of the direct-threat defense based on a single fact demonstrates that one fact issue is sufficient to defeat an employer's motion for summary judgment on this defense. With several disputed facts in the record, a jury could reach a similar conclusion here.

*Werner* and *Sanders* apply straightforwardly here.[8] Like in *Sanders* and *Werner*, Christensen was discriminated against based on his employer's unfounded fears about his perceived disability. Like in *Werner*, UP failed to conduct a bespoke evaluation of Christensen's actual capabilities in 2016, 2018, and 2020. Like in

---

[8] UP incorrectly argued that this Court's precedent in *Sanders* is not persuasive or "informative." App.Vol. 8 at 1816, R. Doc. 70, at 5. This attempt to distinguish *Sanders* is flawed. *Sanders* is binding precedent for the district courts in this circuit. The factual distinctions that UP strained to draw fail and *Sanders* remains controlling in its interpretation and application of the direct-threat defense.

Appellate Case: 25-2173    Page: 53    Date Filed: 08/27/2025 Entry ID: 5552097

*Sanders*, Christensen presented evidence that UP's decision was flawed, baseless, and not based on the best objective evidence or current medical knowledge. Also, like *Sanders* and *Werner*, UP imposed restrictions contrary to the recommendations of treating physicians and industry standards. A reasonable jury could reject UP's direct-threat defense on these facts.

This Court's precedent in *Werner* and *Sanders* mandates reversal of the district court's summary judgment order because UP has not met its burden of proving its direct-threat affirmative defense as a matter of law. *Werner*, 142 F.4th at 1133 (emphasizing the heavy burden of proof under the direct-threat defense and rejecting, as a matter of law, off-the-rack assessments); *Sanders*, 108 F.4th at 1062 (upholding a jury verdict rejecting the direct-threat defense because employer did not reach an objectively reasonable determination nor rely on the best objective or most current medical knowledge). This Court should follow its own precedent and reverse summary judgment because UP cannot prove, as a matter of law, that its determinations satisfy the defense.

UP bears the burden of proving the direct-threat affirmative defense. *Werner*, 142 F.4th at 1133; *Sanders*, 108 F.4th at 1062. This burden is elevated at summary judgment, requiring it prove each element as a matter of law. *Celotex*, 477 U.S. at 324. UP has not met this burden. The record shows genuine disputes of material fact exist about whether UP's direct-threat determination was proper under the defense.

44

A jury could find that UP did not perform a proper ADA direct-threat assessment, as was required. *See* 29 C.F.R. § 1630.2(r) (requiring direct-threat assessment to be "individualized," to be based on the employee's "present ability" to do his job, and to be based on "the most current medical knowledge and/or on the best available objective evidence"). The conflicting testimony in the record, Drs. Holland and Charbonneau's lack of relevant specialized knowledge or examination of Christensen, the questionable applicability and currency of the MEH, and the fact that Christensen was approved to reinstate his CDL in 2016 by a certified FMCSA medical examiner eviscerates UP's direct-threat defense. UP has plainly failed to demonstrate that the evidence was so one-sided that no reasonable jury could resolve the defense in Christensen's favor.

### 1. UP's off-the-rack approach dooms its direct-threat defense.

UP has not proven that it conducted the individualized assessment required by the direct-threat defense. The individualized assessment requirement "protect[s] disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Wal-Mart*, 477 F.3d at 571 (citation omitted). Such unfounded fear is exactly what UP's policy perpetuates when it imposes blanket 5-year restrictions based on a categorical assumption that an employee who has suffered a particular kind of stroke within the last five years cannot safely perform a safety-sensitive job, regardless of the individual's circumstances. App.Vol. 1 at 65, R. Doc. 50, at 14. It

Appellate Case: 25-2173     Page: 55     Date Filed: 08/27/2025 Entry ID: 5552097

only makes matters worse that in this case, UP acted on this unfounded fear in imposing what in effect were permanent restrictions.

As this Court concluded in *Werner,* one-size-fits-all policies are incapable of supporting the direct-threat defense. In *Werner,* this Court scrutinized and ultimately rejected the employer's direct-threat defense as a matter of law and emphasized that the defense is a high bar and requires a genuinely individualized analysis. *Werner,* 142 F.4th at 1133. After *Werner,* a direct-threat determination based on generalizations rather than specific, individualized evidence related to the employee's capabilities fails to satisfy this defense. This is consistent with other Circuit's recognition that "both the letter and the spirit" of the ADA require an individualized assessment of "actual condition," rather than a "determination based on general information about how an uncorrected impairment usually affects individuals." *Branham v. Snow,* 392 F.3d 896, 903 (7th Cir. 2004) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999)); *Nall v. BNSF Ry. Co.,* 917 F.3d 335, 344 (5th Cir. 2019) (finding a "direct threat determination must result from an individualized assessment of the particular employee based on the... objective evidence, not a categorical conclusion that an employee with a particular disability cannot safely perform a job") (citation omitted).

Under this precedent, UP's categorical, blanket policy dooms UP's defense full-stop because, like in *Werner,* such a one-size-fits-all policy does not constitute a bespoke evaluation of Christensen's actual capabilities in 2016, 2018, and 2020 that is

46

required under the individualized assessment prong. But at the very least, *Werner* confirms that material fact questions exist on whether UP's FFD constituted an individualized assessment of Christensen's then-current capabilities in 2016, 2018, and 2020.

A jury could determine that UP failed to conduct "an individualized assessment of [Christensen's then] present ability to safely perform the essential functions of the job." 29 CFR § 1630.2(r). UP's policy does not consider Christensen's health, mitigating treatments and therapies, or job functions. In fact, UP even admits that in 2015, "Holland worked to adopt common guidelines based on the 2014 FMCSA [MEH] *to decrease variation between cases.*" App.Vol. 8 at 1896, R. Doc. 57, at 4 (emphasis added). But this variation between cases is exactly what the ADA operates to preserve with its individualized assessment requirement. Blanket policies that "decrease variation between cases" are inconsistent with the spirit of the ADA and efficiency is not a justification to discriminate based on disability.[9]

UP did not assess whether Christensen could perform the essential job functions through functional capacity evaluations or additional neurocognitive testing, nor did it specifically account for Christensen's mitigating treatments. The record thoroughly underscores the significance of accounting for individualized factors when

---

[9] *Supra* I.B.3. (discussing the purpose of the ADA and the narrow direct-threat defense).

47

accurately assessing post-stroke patients. UP's own expert witness, Fayad, testified that without that contact with Christensen he had no way of evaluating ongoing deficits. App.Vol. 4 at 778, R. Doc. 63-3, at 37:4-14. But Holland did not physically examine Christensen or consult Christensen's physicians. App.Vol. 5 at 1136, R. Doc. 63-7, at 64:13-24. The blanket 5-year work restrictions do not account for the impacts of current treatment options, as recovery time will vary drastically depending on an individual's full medical history and mitigating treatments. UP's one-size-fits-all policy disregards these critically individualized factors. Given the material disputes as to whether UP performed a sufficiently individualized assessment, summary judgment on the direct-threat defense is inappropriate.

### 2. A jury could find that the blanket 5-year work restrictions were not objectively reasonable, based on the controverted testimony.

The question of whether UP relied on objectively reasonable medical judgment is a jury question when the record contains controverted testimony and evidence. And on the present record, UP's decision to impose the extended work restriction on Christensen is a far cry from objectively reasonable. A jury could find UP's direct-threat determinations in 2016, 2018, or 2020, were not objectively reasonable for several reasons.

A jury could find it was *not* objectively reasonable to rely on the MEH. The FMCSA withdrew the MEH well before Christensen's 2016 FFD, "because some of the information was *obsolete or... prescriptive in nature*" and the FMCSA wanted

48

medical examiners to rely on current medical knowledge and individualized assessments rather than one-size-fits-all approaches. *See* The Qualifications of Drivers: Medical Examiner's Handbook and Medical Advisory Criteria Proposed Regulatory Guidance, 87 FR 50282-01 (emphasis added). Accordingly, FMCSA medical examiners "were informed that the [MEH] was no longer in use" and should not be considered "Agency guidance." *Id.* (emphasis added). It is undisputed that Holland relied on the MEH as prescriptive rules, despite knowledge that it had been withdrawn. App.Vol. 1 at 53, R. Doc. 50, at 2. But it is materially disputed whether it was objectively reasonable to do the exact thing the FMCSA expressly instructed against, that is: "to go online, download [the MEH] and... us[e] the [obsolete] guidelines" in Christensen's FFD "as if it had not been pulled from the Internet." App.Vol. 7 at 1488, R. Doc. 63-11, at 41:9-22.

Even if a jury were to find it reasonable to rely on the MEH to determine which conditions may warrant an FFD, or to mirror the FMCSA's then-current safety-standards, a jury is likely to find the 5-year blanket restriction policy to be unreasonable. For one, Christensen has met the FMCSA's safety-standards since January 2016 when a certified FMCSA medical examiner determined Christensen was able to safely return to commercial driving. *Supra* at 10. The fact that Christensen was granted a CDL meant he had necessarily passed an FMCSA medical examination according to the rigors of the very FMCSA safety-standards that UP says it adopted.

49

Holland knew Christensen had renewed his CDL—and thus knew that Christensen was able to return to his safety-sensitive position according to the FMCSA. App.Vol. 5 at 1139, R. Doc. 63-7, at 67:1-4. This is enough to lead a jury to determine that UP's determination was not reasonably based on the FMCSA's then-current safety-standards.

Moreover, the record contains testimony and evidence upon which a reasonable jury could conclude the 5-year restriction was not objectively reasonable. For one, Christensen was released to RTW with no restrictions by his treating physicians, all of whom physically examined Christensen, and many of whom are highly trained specialists with years of experience treating and assessing post-stroke patients. According to his doctors, Christensen made an "excellent recovery" and could return to performing the same activities that he had prior to his stroke, including working as a commercial driver and conductor. *Supra* at 12-15.

The trial court dismissed Cragun and Call's testimony, seemingly accepting UP's baseless questioning of the doctor's "understanding and consideration of Christensen's job duties." App.Vol. 8 at 1875, R. Doc. 74, at 2. But both Call and Cragun explicitly knew and understood Christensen's job duties as a Train Conductor when releasing him to return to work. And Call testified that he considered public safety in deciding that Christensen should not return to work until after he had passed through the primary high-risk period for recurrent stroke without incident. As Call's

50

testimony explains, the risk of another stroke is highest in the days *immediately* following the initial stroke—particularly within 30-to-90 days and declining depending on individual factors—according to his experience and understanding of current best practices in stroke care. App.Vol. 4 at 705, R. Doc. 63-1, at 48:12-18.

Christensen's physicians' clinical findings are bolstered by their specialized knowledge, exceptional qualifications, and experience, which Holland lacks. *Supra* at 19. Whether Holland's decision to impose restrictions that contradict the clinical findings of specialists was objectively reasonable is a fact issue. *See e.g., Baldwin*, 2025 WL 2179316 at *4; *Sanders,* 108 F.4th 1055 at 1064; *Echazabal,* 336 F.3d at 1027-28. This question should be answered by a jury, rather than the court.

Even Holland's own testimony regarding his extensive experience at UP suggests that the 5-year restriction was unreasonable, as he testified that he was unaware of *any* instances in which an employee received 6-month or 1-year restrictions post-stroke and later had a sudden incapacitation event that hurt someone. App.Vol. 5 at 1107, R. Doc. 63-7, at 35:4-11. A reasonable jury could conclude that the blind application of the blanket policy is objectively <u>un</u>reasonable. *Werner*, 142 F.4th at 1133; *Sanders,* 108 F.4th at 1064 (confirming a jury is not required to accept testimony of employer's witnesses); *Torgerson*, 643 F.3d at 1031. Whether UP's determination and reliance on the MEH was objectively reasonable is a material question that requires credibility determinations.

51

### 3. UP failed to prove it relied on the best and most current objective medical evidence.

The direct-threat assessment must rely on the 'best current medical or other objective evidence" and on a controverted record, such as this one, it is up to the jury to decide which evidence it believes. *Werner*, 142 F.4th at 1133 (citation omitted); *Baldwin*, 2025 WL 2179316 at *4 (confirming that a jury instruction that failed to "require the jury to find that [UP]'s threat determination relied on objective medical evidence or current medical knowledge" was erroneous because it did not capture "the full scope of the employer's burden under [Eighth Circuit] standards."); *Sanders*, 108 F.4th 1055 at 1064; *Baker*, 580 F.Supp.3d at 660; *Campbell v. Union Pac. R.R. Co.*, 2020 WL 5300734, at *9 (D. Idaho Sept. 4, 2020) (denying summary judgment on UP's direct-threat defense because conflicting testimony about plaintiff's ability "to perform the job without significant risk of harm... create[d] a genuine issue of disputed fact"). The controverted testimony from Christensen's highly specialized physicians, Christensen's approval by a certified FMCSA medical examiner in 2016, and the testimony regarding the currency of the MEH are not innocuous disputes. Each of these issues provides sufficient grounds for a jury to reject UP's direct-threat defense.

*Sanders* is particularly instructive here. Many of the arguments UP raised before the district court in support of its direct-threat defense are the same arguments that this Court rejected in *Sanders*. In *Sanders*, this Court found "sufficient evidence... for a jury to conclude that UP failed to prove the second and third elements of the

52

defense." 108 F.4th at 1062. Sanders' medical expert testified that UP's approach was "uncalled for," "wrong," and "not based on any medical principles at all," which rendered UP's determination unreasonable. *Id.*

Under *Sanders,* whether UP's direct-threat determination was based on the most current medical knowledge or best objective evidence was a disputed fact that a jury could reasonably resolve in favor of Christensen. 108 F.4th at 1062.

For one, a reasonable jury could find that the MEH was not the most current medical knowledge of post-stroke seizure risk based on the undisputed fact that the FMCSA had previously withdrawn the MEH because it contained "obsolete" medical information. *Supra* at 10. This exact question has come up in other cases at the district court level. As a district court recently concluded in *Mayer,* the record offers "a concrete basis... that would allow the jury to conclude the FMCSA ICD rule is not [the] most current medical knowledge." *Mayer,* 2025 WL 1827621 at *15. A similar conclusion was adopted by a district court in *Brasier v. Union Pac. R.R. Co.,* which concluded "[a] jury could reasonably infer from Morris's testimony and the circumstances of the [MEH]'s sudden withdrawal that the [MEH] was no longer the most current and best available evidence at the time [UP] assessed [the employee]." 2023 WL 2754007, at *9. The *Mayer* and *Brassier* orders aptly identify the triable issue of fact based on the same evidence here. Call's testimony, as a seasoned specialist in the most current treatment paradigms for stroke patients, also supports a conclusion

Appellate Case: 25-2173     Page: 63     Date Filed: 08/27/2025 Entry ID: 5552097

that the MEH was not the best objective evidence at the time. Call's testimony that the Utah Stroke Task Force meets quarterly to share best practices and improve stroke-care illustrates that the most current medical knowledge on stroke treatments and risks is actively evolving and thus cannot be found in the obsolete and outdated MEH containing information dating back to the 1980's. App.Vol. 4 at 670, R. Doc. 63-1, at 13:8-12. In the Eleventh Circuit, an employer's testimony, even if based on a good-faith belief that an employee posed a direct-threat, is insufficient if it relied on outdated medical restrictions rather than particularized facts using the best objective evidence—a question for the jury. *Lowe v. Alabama Power Co.*, 244 F.3d 1305 (11th Cir. 2001).

In fact, a jury needs only accept that the most current medical knowledge at the time indicated that seizure risk is not categorically dependent on the location of a stroke and instead varies based on individual factors such as severity, treatment, and recovery, to reject UP's defense. Given the documented evidence of Christensen's complete recovery, resolution of the atrial fibrillation that caused his stroke, and—as Call's testimony proves—the evolving science and treatments in stroke medicine, the risk that Christensen might experience a sudden incapacitation event while operating the train is nothing more than a "speculative or remote risk." 29 C.F.R. § 1630.2(r). This is not enough to constitute a direct-threat as "[p]ermitting employers to obtain summary judgment by identifying... unlikely [safety] scenarios would eliminate ADA protection for disabled individuals." *Osborne*, 798 F.3d at 1278. Even if UP

54

Appellate Case: 25-2173     Page: 64     Date Filed: 08/27/2025 Entry ID: 5552097

subjectively believed that a *significant* risk existed, this would not relieve it of liability as a matter of law. *Bragdon v. Abbott*, 524 U.S. 624, 649-50 (1998).

*Sanders* confirms that a reasonable jury can reject an employer's testimony and thus, whether the best objective evidence or most current medical knowledge supported a conclusion that a significant risk exists—to constitute a direct-threat—is a fact question for a jury. As in *Sanders,* a jury could resolve this question in Christensen's favor and conclude that UP's reliance on Holland's unspecialized opinion and the outdated, inapplicable, MEH fails to sustain its direct-threat affirmative defense.

Appellate Case: 25-2173     Page: 65     Date Filed: 08/27/2025 Entry ID: 5552097

## CONCLUSION

The direct-threat defense does not, and should not, be allowed to offer employers a near-absolute shield against liability for discriminatory actions against employees like Christensen. The district court bypassed Congress's clear intent and ignored the evidence in the record that UP did not satisfy its burden under the direct-threat defense, or, at the very least, raised a material fact question for a jury. This Court should reverse the district court's order and remand the case for jury trial to resolve the disputed questions of material fact.

Date: August 27, 2025

Respectfully submitted,

s/James H. Kaster
James H. Kaster
NICHOLS KASTER, PLLP
4700 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
(612) 256-3200
kaster@nka.com

*Counsel for Plaintiff-Appellant*
*Ross Christensen*

56

Appellate Case: 25-2173     Page: 66     Date Filed: 08/27/2025 Entry ID: 5552097

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,799 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font. This brief and the corresponding addendum comply with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

Date: August 27, 2025                    <u>s/James H. Kaster</u>
                                         James H. Kaster

Appellate Case: 25-2173     Page: 67     Date Filed: 08/27/2025 Entry ID: 5552097

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

Date:  August 27, 2025                   s/James H. Kaster
                                         James H. Kaster

Appellate Case: 25-2173     Page: 68     Date Filed: 08/27/2025 Entry ID: 5552097